J-S67036-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: A.L.R., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: A.F., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1127 MDA 2019 |

Appeal from the Decree Entered June 18, 2019
in the Court of Common Pleas of Berks County Orphans' Court at No(s):
86453

| | | |
|---|---|---|
| IN RE: E.A.R., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: A.F., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1128 MDA 2019 |

Appeal from the Decree Entered June 18, 2019
in the Court of Common Pleas of Berks County Orphans' Court at No(s):
86452

BEFORE:   OLSON, J., DUBOW, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:          **FILED JANUARY 31, 2020**

Appellant, A.F. ("Mother"), files these consolidated appeals from the

decrees entered on June 18, 2019, in the Berks County Court of Common

Pleas, granting the petitions of M.R. ("Father") and involuntarily terminating

her parental rights to her son, E.A.R., born in October 2003, and daughter,

_____

[*] Former Justice specially assigned to the Superior Court.

A.L.R., born in April 2005 (collectively, the "Children"), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), and (b). After review, we affirm the Orphans' Court's decrees.

The Orphans' Court summarized the relevant procedural and factual history as follows:

> M.R. and A.F. are the parents of the minor children E.[A.]R., born October [] 2003, and A.[L.]R., born April [] 2005. Both minors have special needs having been diagnosed with autism. A.[L.]R. is nonverbal and E.[A.]R. is more high functioning, but clearly impaired. After the separation of [F]ather and [M]other, [M]other was the primary caretaker until she was taken by ambulance for a potential overdose while home alone with her [C]hildren. At that time, the [C]hildren were placed into [F]ather's custody. Mother was ultimately granted visitation with the [C]hildren for eight hours on alternate Saturdays.
>
> ***
>
> Mother's last visit with her [C]hildren was the second week of [January[1]] of 2018. Prior to that date, visits occurred, but were sporadic, with [M]other often being late or failing to appear at all. This inconsistency upset E.[A.]R. At one point, [M]other resided with her paramour and his parents in Hanover, PA. The paramour's parents' residence was the site of visitation. Mother was living within a reasonable distance of her children, in York County, PA.
>
> Father became aware that [M]other may have moved out of state. E.[A.]R. received a post card from his mother postmarked in Maine. Father became aware that [M]other had pending drug charges and the listed address for her was out of state. It was clear that [F]ather did not want to give custody of the children to [M]other without knowing her address as he believed she was

---

[1] In its Opinion, the Orphans' Court suggests that the last visit between Mother and the Children occurred in June 2018. However, this appears to be a typographical error, as Mother concedes, "[t]he last custodial visit by Mother was in January 2018." Mother's Brief at 8.

residing in Maine. The [c]ourt found [F]ather credible when he indicated that had [M]other appeared at the ordered custody window he would not have denied the visit, despite his misgivings because the court order obligated him to do so. While [M]other sent emails to [F]ather regarding visitation, she never appeared during her designated visitation time. Mother indicated her eight hour visitation window was "not long enough to really do anything" once the commuting time was excluded but she never sought to take the children to a local venue such as a park in order to continue to foster the parental bond. The testimony of [M]other was disingenuous when she stated she was too afraid of [F]ather to provide her out of state address when she had previously provided him with the local address. She was not actively engaging the [C]hildren's school (IEP meetings, grades, school functions) or with their physicians regarding their medical issues. The [c]ourt specifically found the testimony of [F]ather to be credible.

Orphans' Court Opinion, filed 7/12/19, at 2-4 (unnumbered).

On November 26, 2018, Father filed petitions to terminate involuntarily the parental rights of Mother to the Children.[2] On March 19, 2019, the Orphans' Court conducted a hearing on the petitions.[3] The court heard testimony from Father, Mother, and Father's wife, L.R. ("Stepmother").[4] On June 18, 2019, the orphans' court entered decrees involuntarily terminating Mother's parental rights to the Children. On July 5, 2019, Mother timely filed

---

[2] By order dated January 18, 2019, the Orphans' Court appointed Attorney Sharon Scullin to act as Guardian *ad Litem* and legal counsel for the Children. Order, 1/18/19.

[3] In addition to testimonial evidence, the Orphans' Court also admitted twelve exhibits. However, the exhibits are not included in the certified record.

[4] Stepmother filed petitions seeking to adopt the Children.

notices of appeal.[5] These notices of appeal did not include concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On July 30, 2019, Mother filed her concise statements of errors complained of on appeal.[6] Further, these appeals were consolidated by this Court *sua sponte* on September 18, 2019. **See** Pa.R.A.P. 513.

On appeal, Mother raises the following issues for our review:

1. Did the [Orphans'] [C]ourt err and abuse its discretion in ordering Mother's parental rights involuntarily terminated because Father did not establish by clear and convincing

---

[5] We observe that Mother filed separate notices of appeal as required. **See** Pa.R.A.P. 341, Note ("Where ... one or more orders resolves issues arising on more than one docket or relating to more than one judgment, separate notices of appeal must be filed."); **Commonwealth v. Walker**, 185 A.3d 969, 977 (Pa. 2018) (holding that the failure to file separate notices of appeal from an order resolving issues on more than one docket "requires the appellate court to quash the appeal").

[6] As the Orphans' Court notes in its Pa.R.A.P. 1925(a) Opinion, Mother violated Pa.R.A.P. 1925(a)(2)(i) by failing to file concise statements of errors complained of on appeal concurrently with her notices of appeal. In light of this failure, the Orphans' Court requests that this Court quash Mother's appeal on this basis. See Memorandum Opinion, filed 7/12/19, at 2 (unnumbered). However, as Mother filed Rule 1925(b) statements and there is no assertion of any prejudice, we do not quash or dismiss her appeal. **See In re K.T.E.L.**, 983 A.2d 745, 747 (Pa.Super. 2009) (holding that failure to file a Rule 1925(b) statement concurrently with a Children's Fast Track appeal is considered a defective notice of appeal, to be disposed of on a case-by-case basis, but did not result in dismissal or quashal where there was no prejudice to the other parties as a result of the late filing); **cf. Mudge v. Mudge**, 6 A.3d 1031 (Pa.Super. 2011) and **J.M.R. v. J.M.**, 1 A.3d 902 (Pa.Super. 2010) (failure to file a Rule 1925(b) statement, when ordered by the Superior Court, will result in a waiver of all issues on appeal); **J.P. v. S.P.**, 991 A.2d 904 (Pa.Super. 2010) (finding that the appellant waived issues for appeal by failing to comply with the trial court's order directing her to file a Rule 1925(b) statement within 21 days).

> evidence that Mother failed to perform parental duties in the six months preceding the filing of the Petition to Terminate Parental Rights[?]
>
> 2. Did the [Orphans'] [C]ourt err and abuse its discretion in ordering Mother's parental rights involuntarily terminated because Father did not establish by clear and convincing evidence that there was repeated neglect by [M]other that cause[d] the [C]hildren to be without essential parental care for the continued well being of the [C]hildren that cannot be remedied by future parental care[?]

Mother's Brief at 7.

In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, [47 A.3d 817, 826 (Pa. 2012)]. "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at [325-26, 47 A.3d at] 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, [9 A.3d 1179, 1190 (Pa. 2010)].

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if

the record could also support the opposite result." ***In re Adoption of T.B.B.***, 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

***In re L.M.***, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). This Court has defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***In re C.S.***, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (quoting ***Matter of Adoption of Charles E.D.M., II***, 708 A.2d 88, 91 (Pa. 1998)).

In the case *sub judice*, the Orphans' Court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), and (b). We have long held that, in order to affirm a termination of parental rights, we need only agree

with the Orphans' Court as to any one subsection of Section 2511(a), as well as Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Instantly, we conclude that the certified record supports the decrees pursuant to Section 2511(a)(1) and (b), which provide as follows.

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> \*\*\*
>
> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b); *see also In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*) (stating that we need only agree with the Orphans' Court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm).[7]

---

[7] Based on our disposition herein, we need not consider Section 2511(a)(2).

It is well-established that "Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child *and* refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child *or* fails to perform parental duties." **In re Adoption of Charles E.D.M.**, 708 A.2d 88, 91 (Pa. 1998) (emphasis in original) (citation omitted). In addition,

> [T]he trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

**In re N.M.B.**, 856 A.2d 847, 854-55 (Pa.Super. 2004) (citations omitted).

> This Court has defined parental duty as follows:
>
> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

- 8 -

> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with . . . her physical and emotional needs.

*In re B.,N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004).

We have stated that the Orphans' Court must next consider "the parent's explanation for his or her conduct" and "the post-abandonment contact between parent and child" before moving on to analyze Section 2511(b). *In re Z.S.W.*, 946 A.2d 726, 730 (Pa.Super. 2008) (quoting *In re Adoption of Charles E.D.M.*, *supra* at 92).

In finding grounds for termination of Mother's parental rights pursuant to Section 2511(a)(1), the Orphans' Court observed that Mother's visits had been sporadic and that Mother had not seen the Children since January 2018.[8] Orphans' Court Opinion, filed 7/12/19, at 3 (unnumbered). The court also credited Father's testimony that, if Mother had appeared for her periods of partial physical custody with the Children, Father would have permitted her to

---

[8] As noted previously, the Orphans' Court's Opinion contains an apparent typographical error, as the court wrote that Mother's last visit with the Children occurred in June 2018, despite Mother's concession that she had not visited the Children since January 2018. *See* Mother's brief at 8; *see also* Mother's Proposed Findings of Fact, 6/3/19, at ¶ 24 ("The last custodial visitation given by Father to Mother was in January, 2018.").

exercise custody. *Id.* at 4 (unnumbered). Further, the court noted that Mother had not taken an active role in the Children's schooling or medical care. *Id.*

Nevertheless, Mother contends that the evidence established she traditionally served as the primary caretaker for the Children. Mother's Brief at 13. Mother asserts that Father has maintained primary custody of the Children since Mother's hospitalization in September 2014. *Id.* at 14. Mother claims that although she did not have a custodial visit after January 2018, she did make diligent efforts to contact and arrange custodial visits with the Children. *Id.* Mother alleges that Father stymied her efforts to maintain contact. *Id.* at 14-15. Mother further argues that after moving to Maine in January 2018, she emailed Father to arrange for visitation, but Father refused to permit visits. *Id.* Mother adds that Father prevented her from seeing E.A.R. in October 2018 to celebrate his birthday. *Id.* at 16.

A review of the record supports the Orphans' Court's finding of grounds for termination under Section 2511(a)(1). Father testified that A.L.R. has "low-functioning, nonverbal autism," while E.A.R. has "high-functioning autism with ADHD. . . ." N.T., 3/19/19, at 5. Throughout the parties' marriage, Father and Mother shared parenting responsibilities. *Id.* at 6. However, starting in approximately July 2014, the parties separated, and there was a period of conflict, including Protection from Abuse actions and police involvement. *Id.* at 8. Despite Mother's allegations to the contrary,

Father testified that he was never violent with Mother or the Children. *Id.* at 10. After July 2014, Mother exercised custody of the Children and Father did not see the Children until September 2014. *Id.* at 10-11.

In September 2014, Father received a call from Delaware County Children and Youth Services requesting that Father retrieve the Children from a local hospital. *Id.* at 11. Upon his arrival, Father learned that Mother was hospitalized for a suspected drug overdose. *Id.* at 12. Father testified that E.A.R. was wearing dirty clothes, while A.L.R. was in a diaper covered in dirt and filth. *Id.* Father then went to the former marital home where he observed the residence to be in complete disarray, with pet urine and feces on the floor. *Id.* at 12-13.

Thereafter, the Children resided with Father. *Id.* at 13. From September 2014 through June 2015, Mother had no contact with the Children and did not reach out to schedule visits. *Id.* Mother and Father then entered into a custody order allowing Mother to exercise custody for eight hours every other Saturday. *Id.* at 14. Father testified that Mother cancelled or shortened many of the visits. *Id.* at 15.

In September of 2015, the custody order was modified to require Mother to transport the Children. *Id.* at 14-16. Father testified that Mother continued to appear for visits late on occasion, leave early, or miss them altogether. *Id.* at 17. A final custody order was entered in January 2016, which provided for Mother to exercise physical custody for eight hours every other Saturday. *Id.*

at 17-18.  The order also provided that if Mother were more than 30 minutes late, she would forfeit the visit.  *Id.*  Mother's visits continued to be irregular and became less frequent.  *Id.* at 18-19.

In June of 2017, Mother became transient and eventually moved to a residence in Maine.  *Id.* at 20-21, 27.  Father testified that in the time period leading up to January 2018, Mother did not regularly exercise custody.  *Id.* at 24-25.  Following January 2018, Mother did not see the Children at all.  *Id.* at 25.  When Mother made sporadic requests to exercise custody, Father requested that she provide her address.  *Id.* at 26-27.  Father testified that he wanted to know where Mother lived so that if she did not return the Children he would know where to locate them.  *Id.* at 27.

Ultimately, Mother did not provide her address or appear for any visits. *Id.*  However, Father insisted that, regardless of whether Mother provided her address, he would have allowed her to take the Children consistent with the custody order.  *Id.* at 28, 68-69.  Father explained that he did not "disallow the visit.  If she would have shown up on her scheduled day, I would have had no choice but to allow the kids to see her because of the standing Order. . . ."  *Id.* at 50.

Although Mother did not see the Children after the beginning of 2018, Father acknowledged that Mother wrote emails to him about the Children, including a request to see the Children in October 2018.  *Id.* at 53, 61.  Mother

then followed up with additional emails in October and November 2018. ***Id.*** at 57-59. However, Mother never appeared for a visit. ***Id.*** at 27.

Father further testified that Mother did not perform parental functions for the Children following their separation, recalling that Mother did not attend IEP meetings or school functions. ***Id.*** at 32. Following the parties' separation, Father was responsible for obtaining treatment, therapy, and medical care for the Children. ***Id.*** at 33. Father believed that Mother only attended one meeting regarding the Children's services. ***Id.*** at 32.

Further, Mother did not write to the Children or send them packages or gifts. ***Id.*** at 69. In October 2018, Mother made a request for gifts that she could give E.A.R. for his birthday. ***Id.*** at 28. Father provided a list of gifts that E.A.R. could have but told Mother she could get E.A.R. anything she wanted; however, he noted that if she picked an item that was not on the list, Father did not want it in his home because of the other children. ***Id.*** at 28-29, 53. Mother did not send a birthday present. ***Id.*** at 29. The same scenario played out at Christmas. ***Id.***

Mother testified that, prior to the parties' separation, she had provided the majority of care for the Children. ***Id.*** at 80. Following separation, Mother testified she continued to exercise custody until she "had a bad reaction to the medication [she] was taking . . . ." ***Id.*** at 80, 91-92. Mother acknowledged that Father picked up the Children from the hospital and that she did not see them for almost a year. ***Id.*** at 92. Thereafter, the parties entered into a

formal custody arrangement. *Id.* at 95. Mother contended that Father refused to allow her to visit the Children and, on occasion, would not be present if she was late for a custody exchange. *Id.* at 103-04. Mother recalled multiple times when she would be late and Father would not release the Children to her. *Id.* at 104.

In addition to having custody every other weekend, Mother also was permitted phone calls with the Children. *Id.* at 96. Mother testified that the phone calls were depressing or terrifying, and that the calls would be unanswered, go to voicemail, or would be on speakerphone. *Id.* at 96-97. Mother stopped calling because she did not like speaking to Father, and E.A.R. was uncomfortable because Father and Stepmother listened to the conversation. *Id.* at 101-02.

Mother testified that she moved to New England in April 2018 and had not seen the Children since moving. *Id.* at 97-98. Mother stated that she asked to see the Children, but her requests were refused by Father. *Id.* Essentially, Father requested that Mother provide him with her address, and Mother declined to do so because of Father's prior physical abuse. *Id.* at 127. Mother testified that she did not file a contempt or modification petition because "[e]very time I wanted to file a contempt or anything along those lines, something else would come up and make it almost impossible for me to do that at that time." *Id.* at 99. Instead, Mother sent "tons of emails" to Father and postcards to the Children. *Id.* at 102, 126.

Upon review, we discern no abuse of discretion and do not disturb the Orphans' Court's findings and determinations. Mother essentially argues this Court should give greater weight to her testimony and supplant the Orphans' Court's credibility findings with our own, which we cannot do. *See In re Z.P.*, 994 A.2d 1108, 1115-16 (Pa.Super. 2010). Father filed his petitions to terminate involuntarily Mother's parental rights on November 26, 2018. This Court finds the orphans' court's determination that Mother failed or refused to perform parental duties with regard to the Children for a period of at least six months immediately preceding the filing of the petitions, and its termination of her parental rights under Section 2511(a)(1), is supported by competent, clear and convincing evidence in the record.

We next determine whether termination was proper under Section 2511(b). With respect to the analysis of whether termination of parental rights is proper under Section 2511(b), our Supreme Court has stated:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa.Super. 2012). In *In re E.M. [a/k/a E.W.C. & L.M. a/k/a L.C., Jr.]*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

- 15 -

*In re T.S.M.*, 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d at 1121 (internal citations omitted).

Moreover,

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa.Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011)) (quotation marks and citations omitted).

In the case *sub judice*, in determining that termination of Mother's parental rights favors the Children's needs and welfare under Section 2511(b) of the Adoption Act, the Orphans' Court reasoned as follows:

the [c]ourt considered the needs and welfare of the children. When [M]other had custody, the children were living in filth and not properly clothed. After [M]other stopped her intermittent and infrequent visits and contact, it was noted that E.[A.]R.'s grades increased and A.[L.]R. stabilized with fewer outbursts and fits. The [c]ourt considered the importance of the maternal bond but found it was in the best interest of the children to terminate the rights of [M]other, especially in light of the intention of step-mother to adopt them. The [c]ourt considered both the testimony presented and the report of the Guardian *ad Litem*.[9]

Orphans' Court Opinion, 7/12/19, at unnumbered 4-5.

With respect to Section 2511(b), Mother includes a passing reference that she cared for the Children while she and Father were married, and that "a natural and unbreakable bond developed between Mother and her children." Mother's Brief at 18. Mother asserts that Father placed obstacles in her way and she was not given an opportunity to maintain the bond. *Id.*

Upon our review, we find the record supports the Orphans' Court's holding that the Children's developmental, physical and emotional needs and welfare favor termination of Mother's parental rights pursuant to Section 2511(b). Father testified that once Mother stopped seeing the Children, E.A.R.'s grades increased significantly, and A.L.R. stabilized with her outbursts. N.T., 3/19/19, at 31-32. Father testified that E.A.R. is doing well educationally and that he "is mostly mainstream[ed] in school right now . . . ." *Id.* at 31. While A.L.R. is nonverbal, she continues to show improvement.

---

[9] Attorney Scullin filed a report indicating that she met with the Children. Report of the Guardian *ad Litem*, 2/5/19, at 3. Attorney Scullin reported that A.L.R. was nonverbal and unable to express a preferred outcome, while E.A.R. "clearly stated his preference to stay in his current home and for adoption by his stepmother." *Id.* at 4-5.

*Id.* Additionally, Father testified that it is important to give the Children stability and peace of mind that they have a family with parents who love them and will be attentive to their needs. *Id.* at 35. Father stated neither child suggests that he or she wants to see Mother.[10] *Id.* at 34.

To the contrary, Mother testified that she was always very close to the Children and that the only thing that came between them was Father. *Id.* at 104-05. Mother further testified that she is "incredibly close" with E.A.R. *Id.* at 79.

The credited testimony supports the Orphans' Court's determination that it would best serve the needs and welfare of the Children to involuntarily terminate Mother's parental rights pursuant to Section 2511(b). While Mother may profess to love the Children, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re Z.P.*, 994 A.2d at 1121. As this Court repeatedly has stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id.* at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa.Super. 2004) (citation omitted).

---

[10] Stepmother confirmed that she intends to adopt the Children. N.T., 3/19/19, at 144.

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the Orphans' Court appropriately terminated Mother's parental rights under 23 Pa.C.S.A. § 2511(a)(1) and (b).

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 01/31/2020